**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RONALD T. WHITE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 09 C 6612** |
| | ) | |
| **v.** | ) | **Magistrate Judge Michael T. Mason** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Ronald T. White ("White" or "claimant"), has filed a motion for summary

judgment [14] seeking judicial review of the final decision of the Commissioner of the

Social Security Administration ("Commissioner") denying his claim for benefits under the

Social Security Act, 42 U.S.C. §§ 416(i), 423(d) and 1382c(a)(3)(A).  In response, the

Commissioner filed a cross-motion for summary judgment [23] asking the Court to affirm

the decision of the Commissioner.  We have jurisdiction to hear this matter pursuant to

42 U.S.C. §§ 405(g) and 1383(c)(3).  For the reasons set forth below, claimant's motion

for summary judgment is granted, the Commissioner's motion for summary judgment is

denied, and this case is remanded for further proceedings consistent with this Opinion.

**I.    BACKGROUND**

**A.    Procedural History**

On March 30, 2006, White filed applications for period of disability, disability

insurance benefits ("DIB") and supplemental security income ("SSI"), alleging an onset

date of December 9, 2000.  (R. 124-27, 133.)  For purposes of White's DIB application,

his date last insured was March 31, 2001.  (R. 17.)  The Social Security Administration

("SSA") denied White's claims initially on May 10, 2006 (R. 67-76), and again upon

reconsideration on August 1, 2006.  (R. 85-92.)  Thereafter, claimant filed a timely

request for a hearing.  (R. 94-95.)  On December 13, 2007, claimant appeared with

counsel at a hearing before Administrative Law Judge Denise McDuffie Martin ("ALJ" or

"ALJ Martin").  (R. 29.)  At claimant's request, the record was held open after the

hearing so additional evidence could be submitted.  (R. 62.)

On November 26, 2008, ALJ Martin issued a decision denying White's request

for benefits.  (R. 12-28.)  White filed a timely request for review of ALJ Martin's decision.

(R. 10.)  The Appeals Council denied that request on August 25, 2009, and ALJ Martin's

decision became the final decision of the Commissioner.  (R. 1-3); *Zurawski v. Halter*,

245 F.3d 881, 883 (7th Cir. 2001).  This action followed.

### B.    Medical History

White saw a number of different medical professionals for various reasons during

his incarceration at Dixon Correctional Center ("Dixon") from May 25, 2001 through

March 31, 2006.  Medical progress notes from August 2001 reveal hypertension and

corresponding headaches and dizziness.  (R.190-93.)  Other handwritten progress

notes dated May 2001 through March 2006 include a number of references to

hypertension and asthma.  (R. 248, 252-263.)

As for specific treatment, on September 26, 2001, White was seen in the

psychiatric clinic by a staff psychiatrist, at which time he reported that he had adjusted

to new blood pressure medication.  (R. 185.)  As a result, his headaches had improved.

(*Id.*) White also indicated he was benefitting from his group therapy sessions. (*Id.*) He reported an improvement in mood, appetite, energy, motivation and sleep, and denied hopelessness, anhedonia, or homicidal or suicidal ideations. (*Id.*) White did report a learning disability and complained of low test scores in his classes. (*Id.*) The staff psychiatrist noted that White had an "appropriate and related" affect and "logical and sequential thought" processes. (*Id.*) He saw no signs of tardive dyskinesia. (*Id.*) The psychiatrist diagnosed major depressive disorder, polysubstance abuse and "learning disability per self-report." (*Id.*) White was directed to continue with Sinequan for mood systems. (*Id.*) At an individual therapy session on March 6, 2002, White complained of feelings of depression. (R. 187.) Dysthmia was indicated as the Axis I diagnosis. (*Id.*)

On February 24, 2004, claimant visited the orthopedic clinic complaining of "pain at the anterior superior iliac spine of the right hip." (R. 188.) During that appointment, White explained that he was shot in the right hip in either 1982 or 1983, and the bullet remained lodged in that region. (*Id.*) On occasion, the pain caused his right knee to buckle. (*Id.*) Examination showed the patient walking with a normal gait. (*Id.*) There was full flexion, extension, and rotation of the right hip without any pain, although there was "tenderness on palpation at the right anterior superior iliac spine region of the right hip." (*Id.*) The left hip had full active range of motion without pain. (*Id.*) Both lower extremities had good circulation and sensation. (*Id.*)

White underwent a routine physical examination on December 16, 2005. (R. 249-251.) That exam revealed a history of asthma, hypertension and diabetes, all of which were controlled. (R. 249.) Among other things, the physician assessed obesity

and recommended a low fat diet.  (R. 254.)

Notes from an individual therapy session on June 22, 2004 reveal an increase in depressive symptoms.  (R. 186.)  The Axis I diagnosis was documented as chronic PTSD.  (*Id.*)  Individual therapy notes from February 13, 2006 indicate that White suffers from PTSD and dysthymia.  (R. 245.)  At that therapy session, White "continued to identify and challenge cognitive distortions."  (*Id.*)  He appeared alert and his thought content was good.  (*Id.*)

On March 15, 2006, Dixon's SSA liaison and a Dixon health care professional completed the "Prescreening Information Checklist" for the SSA.  (R. 148-149.)  To their knowledge, White did not suffer from any medical conditions, physical or mental, that prohibited him from performing his work duties while incarcerated, or restricted his normal activities.  (*Id.*)  The form explicitly indicates that the information provided "will be used by SSA to determine priority of processing and not final eligibility."  (*Id.*)

As a condition of White's release from Dixon in March 2006, he was required to undergo substance abuse counseling and outpatient mental health counseling, "due to his history of polysubstance [abuse] and mental health issues."  (R. 230.)  White apparently did not participate in the substance abuse program at Dixon.  (*Id.*)

Immediately following his release, White underwent a number of consultative examinations.  On April 17, 2006, Dr. Helena Radomska of Chicago Consulting Physicians conducted a psychiatric evaluation.  (R. 267-271.)  Dr. Radomska noted that White walked with a cane, "although there was no abnormality of his gait."  (R. 267.)  White reported that he suffered a major trauma at the age of nine when he witnessed

4

his father cut his mother's throat. (*Id.*)  The incident always plays over in his mind. (*Id.*)
On occasion, White has nightmares and flashbacks. (R. 268.)  He also explained that
he sometimes sees a finger pointing at him and hears voices "telling him he is not
good." (*Id.*)  White reported that he is taking medication for depression, which helps him
75% of the time, but makes him groggy during the day. (R. 267.)  White complained of
problems with comprehension, as well as variance in mood. (R. 268.)  He denied
suicidal or homicidal ideation, panic attacks and obsessive compulsive symptoms. (*Id.*)
As for daily activities, White told Dr. Radomska that he does not have a set schedule,
but mainly stays at home and sometimes goes to bed. (*Id.*)  White admitted to abusing
heroin and crack/cocaine for 20 years before going to prison. (R. 269.)  He denied daily
use of alcohol. (R. 268.)

Dr. Radomska reported White's mood as dysphoric with mood congruent affect.
(R. 269.)  She diagnosed major depression with psychotic features, currently partially
treated with medication; a history of polysubstance abuse and dependence, currently in
remission from cocaine and heroin; a possible history of PTSD; hypertension; asthma;
and a bullet lodged in his right hip. (R. 270.)  As for stressors, Dr. Radomska reported
that White was still depressed, hearing voices and having trouble adjusting to life after
prison. (*Id.*)  White's Global Assessment of Functioning ("GAF") at the time was 50.[1]
(*Id.*)

---

[1]  The GAF is a scale of zero through 100 used by medical health professionals to rate social, occupational, and psychological functioning of adults.  *White v. Astrue*, --- F.Supp.2d ----, 2011 WL 5039802, at * 4, n.2 (N.D. Ill. 2011) (citing Diagnostic & Statistical Manual of Mental Disorders Text Revision 34 (4th ed. 2000)).  A GAF score from 41 to 50 means "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *Id.*

Also on April 17, 2006, claimant underwent an internal medicine examination with

Dr. Dominic Gaziano of Chicago Consulting Physicians.  (R. 281-287.)  White

complained of asthma, high blood pressure and pain in his right hip.  (R. 281.)

According to White, his asthma is elicited by dust, pollen and smoke, and he is short of

breath every day.  (*Id.*)  White reported compliance with his blood pressure medication.

(R. 282.)  He complained of occasional right leg weakness and stated that he can walk

a block and a half without a cane.  (*Id.*)

Dr. Gaziano reported that White could walk fifty feet without assistance, but

noted that he ambulated with short steps.  (R. 282.)  Toe walk was normal, but claimant

was unable to heel walk.  (*Id.*)  Claimant was able to squat one-fourth of the way to the

floor.  (*Id.*)  White had limited range of motion of the lumbosacral spine to 80 degrees of

flexion and 20 degrees of extension.  (*Id.*)  Flexion and extension were not associated

with pain.  (R. 282-283.)  White had decreased range of motion of his right hip to 100

degrees of flexion and 20 degrees of abduction.  (R. 283.)  Both flexion and extension

were associated with pain.  (*Id.*)  Grip strength and dexterity were normal.  (*Id.*)  Bilateral

hip flexors strength was -4/5; bilateral knee flexion/extension was the same.  (*Id.*)

Straight leg raising was negative.  (R. 286.)  An x-ray from his visit revealed a "bullet in

the soft tissues adjacent to the superolateral aspect of the right ilium with multiple

fragments probably embedded in the ilium and a post-traumatic exostosis from the

superolateral margin."  (R. 274.)  The radiologist indicated that there may be very slight

central narrowing of the hip joint.  (*Id.*)  A pulmonary function test showed mild

restrictions both pre and post bronchodilation.  (R. 275.)

Based on his examination, Dr. Gaziano assessed a history of asthma,

6

hypertension and gun shot wound.  (R. 283.)  He found that claimant had difficulty ambulating for longer than one and a half blocks, but no history of lower extremity weakness.  (*Id.*)

Claimant saw Dr. Gaziano again on May 1, 2006 for another evaluation in connection with his application for state public aid.  (R. 218-232.)  During that evaluation, White complained of insomnia, difficulty concentrating, and shortness of breath, with occasional chest pains.  (R. 231.)  White admitted to smoking half a pack of cigarettes a day, but denied alcohol or illicit drug use.  (*Id.*)  Dr. Gaziano diagnosed hypertension, asthma, PTSD and major depression.  (R. 219.)  Dr. Gaziano further reported a negative straight leg raising test and again noted that White could walk fifty feet without assistance.  (R. 223.)  White could squat half way to the floor.  (*Id.*)  White exhibited normal range of motion in the hips, knees, ankles, shoulders, elbows and wrists.  (*Id.*)  Flexion of the lumbar spine was limited to 80 degrees.  (*Id.*)  A handwritten note on the evaluation indicates that White brought a cane with him.  (*Id.*)

According to Dr. Gaziano, claimant had up to 20% reduced capacity in the following activities in an eight-hour workday: walking, bending, standing, stooping, sitting, turning, climbing, pushing, pulling and grasping.  (R. 222.)  White could lift no more than 10 pounds at a time.  (*Id.*)  With respect to mental impairments, Dr. Gaziano reported normal social functioning, but mild limitations in activities of daily living and concentration, persistence, and pace.  (*Id.*)  There were no episodes of decompensation in the preceding twelve months.  (*Id.*)

On April 28, 2006, claimant sought treatment for respiratory problems at

Provident Hospital of Cook County. (R. 314-323.) On May 25, 2006, White presented

to the emergency room of Stroger Hospital complaining of chest pain. (R. 369-375.) He

reported a history of hypertension and asthma, depression and PTSD, and complained

of difficulty sleeping. (R. 369.) He stated that his asthma was well controlled. (*Id.*)

According to White, he had been off his medication since his release from prison. (R.

374.) He reported feelings of sadness, fatigue and anxiety. (*Id.*) White said that he has

intrusive thoughts and nightmares and explained that he hears voices that "talk down to

him [and] tell him he's worthless." (*Id.*) The examining physician assessed major

depressive disorder with psychosis, PTSD, and a history of heroin and alcohol abuse.

(*Id.*)

White returned to the Stroger emergency room on June 6, 2006 for follow-up

stress testing and to establish outpatient care. (R. 338.) He denied chest pain at that

visit. (*Id.*) White brought his cane with him and was unable to walk on a treadmill for

testing. (R. 339.)

The record also includes a letter dated June 23, 2006 from Dr. Patrika Smith of

Stroger Hospital. (R. 337.) Dr. Smith reported multiple illnesses including hypertension,

chest pain (etiology unclear), degenerative joint disease of his lumbar spine, PTSD,

major depression with psychosis, asthma, headaches and decreased vision in the left

eye. (*Id.*) According to Dr. Smith, the chronic pain in White's hip and leg leads to

difficulty ambulating, sitting or standing for long periods of time. (*Id.*) Dr. Smith also

reported that White has been dealing with psychiatric issues which affect his feelings of

self worth, guilt and anxiety. (*Id.*) She noted that because the medical system is

overwhelmed, it is difficult for White to obtain appointments and see physicians in a

8

timely manner.  (*Id.*)

Records reveal that in July 2006, White began outpatient psychiatric treatment with Dr. Adedapo Williams for major depressive disorder, PTSD and anxiety.  (R. 390-391.)  White reported that he usually sleeps all day or lays in bed and watches television, and sometimes bakes.  (R. 390.)  White also reported that he serves as a deacon at his church.  (*Id.*)  He complained of nightmares three to four times a week and that he occasionally hears voices telling him that he is worthless.  (*Id.*)  White indicated that he has problems with his medication because they make him tired.  (*Id.*) (*Id.*)  Dr. Williams reported White's GAF as 50.  (R. 382.)  At a follow up appointment with Dr. Williams on August 21, 2006, White reported that he was feeling better and sleeping well.  (R. 381.)  No psychotic symptoms were reported.  (*Id.*)

On November 6, 2006, White visited the University of Chicago emergency room complaining of chest pain, which he described as "tightness."  (R. 340.)  Because White was unable to walk on a treadmill, he could not participate in the exercise stress test. (*Id.*)  A stress electrocardiogram demonstrated no evidence of myocardial ischemia. (*Id.*)

Treatment records from May 9, 2007 indicate that White did not attend recent therapy appointments due to transportation difficulties.  (R. 388-389.)  White reported difficulty sleeping, fatigue, helplessness, guilt and feelings of sadness.  (R. 388.)  He complained of panic attacks two times a week.  (*Id.*)  White denied auditory or visual hallucinations.  (R. 387.)  Dr. Zimmerman refilled White's prescriptions because he apparently ran out in December of 2006.  (R. 388.)

On November 7, 2007, White returned to the Stroger emergency room seeking

9

refills of his medication. (R. 355-360.) According to treatment notes, White stated that he needed refills before Haymarket would accept him.[2] (R. 355.) Hypertension and depression were noted and White was discharged with an instruction to follow up with the psychiatric department. (R. 358.)

On December 12, 2007, White again saw Dr. Williams and asked that he complete a psychiatric impairment report. (R. 346-352.) Dr. Williams, who indicated he had been treating White since July 7, 2006 with psychotherapy and medication, listed White's diagnoses as major depressive disorder and PTSD. (R. 346.) As for symptoms, Dr. Williams reported thinking and mood disturbances, hallucinations, sleep loss, decreased energy, feelings of worthlessness, and recurrent recall of trauma. (R. 347-348.) Without much elaboration, Dr. Williams opined that White's illness restricts his daily activities, causes poor motivation and loss of interest, and causes repeated episodes of deterioration in work or work-like situations. (R. 350-351.) According to Dr. Williams, although White has had a fair response to treatment, he is not able to work in a non-sheltered work setting. (R. 351-352.)

Handwritten treatment notes from White's December 12, 2007 visit to Dr. Williams reveal that White reported he was doing well. (R. 359.) His mood was fine, "but only if he takes his meds." (*Id.*) He did complain of nightmares about his father being violent to the family and a flashback "of his mother laying in a pool of blood." (*Id.*)

---

[2] The Haymarket Center is a "comprehensive alcohol and other drug treatment organization," the purpose of which is "to aid people with chemical dependency in their recovery, by providing a continuum of optimal professional care that is responsive to the identified needs of the community." *See* http://www.hcenter.org/index.html.

He denied paranoid thoughts and suicidal and homicidal ideations.  (*Id.*)

### C.    Claimant's Testimony

White was born on December 27, 1956.  (R. 32.)  At the time of the hearing, he was 5' 9" and weighed 230 pounds.  (R. 34.)  White testified that he graduated high school and that he currently lives with his wife and one of his four children.  (R. 33.)

In the fifteen years prior to the hearing, White worked at various nursing homes as a certified nursing assistant ("CNA").  (R. 35.)  In each of his CNA positions, he was required to stand and walk all day, and lift and carry patients.  (R. 35-36.)  According to White, he was most recently employed by Macy's as a prep cook in 2006.  (R. 34.)  Although he enjoyed the job, he had difficulty standing.  (R. 35.)  White was terminated after six weeks at Macy's due to his criminal background.[3]  (R. 34, 49.)

White carried a cane with him to the hearing, which he testified he received at Dixon because of his back pain and the bullet in his right hip.  (R. 36.)  White uses his cane mostly in his left hand, but sometimes in his right hand.  (R. 37.)  White testified that, even with his cane, he cannot walk a block without having problems, and that he has difficulty keeping pace with other people.   (R. 36-37, 40.)  White is able to walk up the four steps to the door of his home, but would not be able to walk up to a second or third floor.  (R. 40.)  White testified that he could probably pick up fifteen pounds, but could not carry it.  (R. 47.)  He could not pick up twenty pounds because it would hurt his back.  (R. 48.)

---

[3] Although one portion of the hearing transcript indicates that White was terminated because of his "back problem," (R. 34.), during questioning by the ALJ, White clarified that Macy's terminated him after receiving results of a background check.  (R. 49.)

White can stand for fifteen to twenty minutes and sit for thirty to thirty-five minutes before having trouble. (R. 37-38.) The pain he experiences after standing or sitting for too long is located in the center of his back and his right hip. (R. 38.) On occasion, the pain moves up his back and to his left side. (*Id.*) For pain relief, White takes Tylenol III's, prescribed by Dr. Chen, every other day. (R. 38-39.) He also takes Ibuprofen and Motrin. (R. 39.) After taking his medication, White is able to walk a couple of blocks. (*Id.*) Although the medication helps with temporary pain relief, the pain always returns. (*Id.*)

White testified that he also suffers from asthma, which he treats approximately twice a week with an inhaler. (R. 40-41.) Damp weather worsens his asthma and he experiences shortness of breath between asthma attacks. (R. 41.) White further testified that he suffers from hypertension and cannot see out of his left eye. (R. 41-42, 48.)

With respect to his psychiatric problems, White testified that he has suffered from PTSD since he witnessed his "father beat [his] mother to death" when he was twelve years old. (R. 42.) He testified that his father nearly cut his mother's head "off her shoulder." (*Id.*) White also suffers from depression. (R. 44.) White sees a psychiatrist, Dr. Williams, approximately every three weeks, and a psychologist every Wednesday. (R. 42-43.) White testified that he has been doing so since he got out of prison. (R. 50.) The combination of White's medications "drains" him and makes him not want to leave the house. (R. 44.) White cries easily, gets angry easily and sometimes has difficulty concentrating. (R. 45-46.) White has hallucinations of "things that [he] witnessed and a lot of blood." (R. 45.) He also hears voices telling him that he

12

is "not worthy." (*Id.*)  These "intrusions," as White calls them, come mostly at night and he often has difficulty sleeping.  (R. 45-46.)

During a typical day, between eating and bathing, White mostly sleeps.  (R. 46-47.)  While he keeps his appointments with his psychiatrist, and sometimes walks around the block, he does not go out of the house every day.  (R. 47.)  His 33-year old daughter who lives with him does the cooking, cleaning, and grocery shopping.  (*Id.*)  White smokes half a pack of cigarettes a day.  (R. 50.)  He does not drink alcohol, but uses illegal drugs, specifically marijuana and cocaine, about twice a month.  (*Id.*)

### D.    Medical Expert's Testimony

Dr. Ashok Jilhewar, who practices internal medicine in Chicago, appeared and testified at the hearing before ALJ Martin.  (R. 51.)  He reported that he reviewed all the documents in the record, including those that were submitted the day of the hearing. (*Id.*)  Dr. Jilhewar first asked White what kind of treatment he is receiving for his back and hip pain, in particular whether he has received physical therapy, injections or consulted with an orthopaedic surgeon.  (*Id.*)  White responded that he is not currently receiving any treatment for his back or hip.  (*Id.*)  According to White, every time he visits the hospital about his back, the physicians focus on his high blood pressure and tell him to simply take his pain medication.  (R. 51-52.)

Dr. Jilhewar went on to summarize the medical records and provide his opinion of White's condition.  He testified that White suffers from intermittent bronchial asthma and that his pulmonary function test revealed a mild impairment.  (R. 52-53.)  Dr. Jilhewar also discussed White's hypertension, describing it as "not well-controlled" and moderate, with no documentation of any end organ damage.  (R. 53.)  With respect to

13

obesity, Dr. Jilhewar testified that White's weight and height, as reported in a recent consultative exam, resulted in a Body Mass Index ("BMI") of 38. (*Id.*) As Dr. Jilwehar explained, a BMI of 40 is classified as morbid obesity. (*Id.*)

Dr. Jilhewar reported that White had a history of a gunshot injury to the right hip, but that he did not know when that injury occurred. (R. 53.) He found no documentation that White received treatment for the gunshot injury, the resulting hip pain, or the back pain while in prison, which lead Dr. Jilhewar to testify that White's testimony to the contrary was inconsistent. (*Id.*) Referring to the April 17, 2006 consultative exam, Dr. Jilhewar testified that although White had mild to moderate weakness in his right hip flexors and right knee flexor, his gait was reported as normal. (R. 54.) Dr. Jilhewar found no additional indication in the record that White has any gait problem or need for the use of a cane. (*Id.*) He noted that if the cane was provided in prison, as White testified, he found no documentation of that fact. (*Id.*) Dr. Jilhewar also found no documentation of "intractable headaches." (R. 55.)

As for White's psychiatric issues, Dr. Jilhewar noted that White has been diagnosed with PTSD, polysubstance abuse, dysthymia and major depressive disorder. (R. 55.) According to Dr. Jilhewar, in the absence of decompensation or institutional placement, White does not equal listing 12.04 (affective disorders) or 12.06 (anxiety-related disorders). (R. 56.)

In Dr. Jilhewar's opinion, White has a light functional capacity, meaning he is able to lift twenty pounds occasionally, ten pounds frequently; able to stand for one hour at a time with five minutes of sitting each hour; able to stand six hours in an eight hour day; sit indefinitely; occasionally climb stairs, stoop and balance, but never kneel, crouch or

14

crawl. (R. 56.) Dr. Jilhewar further testified that White can operate moving machinery, but needs to avoid concentrated exposure to pulmonary irritants given his asthma and avoid unprotected heights. (R. 56-57.) When asked by counsel whether evidence of White's use of the cane would change his opinion, Dr. Jilhewar testified that he would need actual documentation that there was a need for use of a cane, that is, a physical therapy record or evaluation. (R. 57-58.)

### E. Vocational Expert's Testimony

Thomas Russet also testified at the hearing as the vocational expert ("VE" or "VE Russet"). VE Russet classified White's past work as a CNA as medium in physical demand and semi-skilled, but noted that, based on White's testimony, he performed the job at the heavy level of physical demand. (R. 58-59.) As for White's position as a prep cook, VE Russet classified that job as light and unskilled. (R. 59.)

The ALJ asked the VE to consider a hypothetical individual the same age as claimant, with the same education and work experience, but with the following limitations: capable of light work; no climbing of ladders, ropes or scaffolds; occasional climbing of ramps and stairs with occasional balancing and stooping; no kneeling, crouching, or crawling; and who must avoid concentrated exposure to pulmonary irritants and protective heights. (R. 59.) The individual would also require a sit/stand option every hour for five minutes and the ALJ further limited the individual to an "unskilled, simple, routine, repetitive, type job." (R. 59-60.) VE Russet testified that such an individual would not be capable of performing any of the claimant's past work. (R. 60.) But, the individual could work as an electronics worker, production assembler, or small products assembler. (*Id.*)

15

When White's attorney was given the opportunity to question the VE, he asked

how his opinion would change if the individual was required to use a cane with his

dominant right hand.[4]  (R. 61.)  The VE responded that the individual could not perform

the previously mentioned job or any other jobs at the light level.  (*Id.*)  Limiting the

individual's ability to concentrate, which would result in frequent failure to complete

tasks, also precludes such an individual from performing any of the jobs mentioned.

(*Id.*)

## II.    LEGAL STANDARD

### A.    Standard of Review

We must affirm the ALJ's decision if it is supported by substantial evidence and

free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th

Cir. 2002).  Substantial evidence is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir.

1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  We must consider

the entire administrative record, but we will not "re-weigh evidence, resolve conflicts,

decide questions of credibility, or substitute our own judgment for that of the

Commissioner."  *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford

v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).  We will "conduct a critical review of the

evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary

support or an adequate discussion of the issues."  *Id*.

In addition, while the ALJ need not discuss every piece of evidence in the record,

---

[4] The basis for this question is unclear seeing as White testified that he mostly uses his cane in his left hand.  (R. 37.)

16

she "must build an accurate and logical bridge from the evidence to [her] conclusion."
*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ must "sufficiently
articulate her assessment of the evidence to assure us that the ALJ considered the
important evidence... [and to enable] us to trace the path of the ALJ's reasoning."
*Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993)

> **B.    Analysis Under the Social Security Act**

To qualify for either DIB or SSI, the claimant must be "disabled" under the Social
Security Act (the "Act"). A person is disabled under the Act if "he or she has an inability
to engage in any substantial gainful activity by reason of a medically determinable
physical or mental impairment which...has lasted or can be expected to last for a
continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A),
1382c(a)(3)(A). In determining whether a claimant is disabled, the ALJ must consider
the following five-step inquiry: "(1) whether the claimant is currently employed, (2)
whether the claimant has a severe impairment, (3) whether the claimant's impairment is
one that the Commissioner considers conclusively disabling, (4) if the claimant does not
have a conclusively disabling impairment, whether she can perform her past relevant
work, and (5) whether the claimant is capable of performing any work in the national
economy." *Dixon*, 270 F.3d at 1176. The claimant has the burden of establishing a
disability at steps one through four. *Zurawski*, 245 F.3d at 885-86. If the claimant
reaches step five, the burden then shifts to the Commissioner to show that the "claimant
is capable of performing work in the national economy." *Id.* at 886.

ALJ Martin followed this five step analysis. At step one, the ALJ found that "the
claimant has engaged in substantial gainful activity since December 9, 2000, the alleged

onset date." (R. 17.) However, because there was "insufficient evidence to conclusively establish the nature of [claimant's] self employment and the manner in which it was performed," ALJ Martin continued with the sequential evaluation. (R. 17-18.) At step two, ALJ Martin found that claimant has the following severe impairments: bronchial asthma, hypertension, history of gunshot wound to the right hip, obesity, depression, post traumatic stress disorder, and history of substance abuse in partial remission. (R. 18.) At step three, the ALJ found that "the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R Part 404, Subpart P, Appendix 1." (R. 22.)

Next, ALJ Martin determined that claimant has the Residual Functional Capacity ("RFC") "to perform light work as defined in 20 C.F.R 404.1567(b) and 416.967(b) except that the claimant needs a sit/stand option allowing him to alternate positions every hour for five minutes." (R. 24.) Additionally, the ALJ found that claimant can never climb ladders, ropes or scaffolds, and can never kneel, crouch or crawl; he can occasionally climb stairs and ramps, and can occasionally balance and stoop; he needs to avoid concentrated exposure to pulmonary irritants and working around unprotected heights. (*Id.*) ALJ Martin also limited claimant to "unskilled, simple repetitive tasks." (*Id.*)

Given claimant's RFC, the ALJ found that claimant was unable to perform any past relevant work. (R. 27.) Finally, at step five, she determined that there are jobs that exist in significant numbers in the national economy that the claimant can perform, including electronics worker, production assembler and small products assembler. (R. 28.) As such, the ALJ determined that claimant has not been under a disability within

18

the meaning of the Act from his alleged onset date of December 9, 2000 through the date of her decision.

Claimant now argues that ALJ Martin erred in assessing his credibility and in determining both his physical and mental RFC. We address each of claimant's arguments in turn below.

### C.     The ALJ Failed to Make a Proper Credibility Determination.

White argues that the ALJ's credibility finding was not supported by the evidence in the record. It is well settled that the ALJ is in the "best position to see and hear the witnesses and assess their forthrightness." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). As such, a reviewing court affords the ALJ's credibility finding special deference. *Id.* Indeed, the court may only disturb a credibility finding if it is "patently wrong," that is, unreasonable or unsupported. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). Despite this deferential standard of review, Seventh Circuit precedent confirms that the ALJ must explain her decision in such a way that allows the reviewing court to determine whether he reached the decision in a rational manner, logically based on his specific findings and the evidence in the record. *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011) (citing *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004) (noting that the "court will affirm a credibility determination as long as the ALJ gives specific reasons that are supported by the record for his finding.")).

The ALJ must also follow the requirements of Social Security Ruling ("SSR") 96–7p. *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir.2003). Among other things, SSR 96–7p requires ALJs to consider the entire case record when evaluating an individual's credibility and give specific reasons for the weight given to the individual's

19

statements.  1996 WL 374186, at *4 (S.S.A. July 2, 1996).

Here, although ALJ Martin provided more than just the oft-frowned upon boilerplate language, *see Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003), on the whole, her credibility determination "does not inspire confidence that [she] undertook a careful examination of the record." *Eakin v. Astrue*, 432 Fed. Appx. 607, at *5 (7th Cir 2011).  First, the ALJ discredited White's testimony that he relies on his cane because "there is no indication that the cane has been prescribed by a physician or that the claimant cannot ambulate without it." (R. 24-25.)  She also placed great weight on the fact that, in her view, the "records from Dixon Correctional Center explicitly indicate that the claimant does not use an assistive device." (R. 25.)

As the Seventh Circuit recently reiterated, assistive devices such as canes and walkers do not require a prescription from a physician.  *Terry v. Astrue,* 580 F.3d 471, 477-78 (7th Cir. 2009); *see also Parker v. Astrue,* 597 F.3d 920, 922 (7th Cir. 2010).  As such, on its own, the lack of a prescription is not enough to discredit the claimant's testimony regarding pain and ability to ambulate without the cane.  What is more, the record here does include evidence that White has difficulty ambulating without his cane.  Indeed, on April 17, 2006, Dr. Gaziano indicated that although White walked fifty feet without his cane, his steps were short and he was unable to heel walk.  (R. 282.)  And, despite ALJ Martin's statement to the contrary, White also sought treatment for hip pain while incarcerated.  (R. 188.)  Unfortunately, the ALJ failed to even address this evidence, let alone articulate her reasons, if any, for discrediting it.  *See Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir.1992) ("The ALJ must minimally articulate his reasons for crediting or rejecting evidence of disability.").  In the same vein, in finding

20

that White's brief stint at Macy's diminished his credibility on his ability to ambulate, the ALJ failed to address White's testimony that he had difficulties standing at that job. (R. 25.)

As for the records from Dixon, although we agree there is no explicit reference to a cane, we question the ALJ's representation that there are explicit statements that White does *not* use a cane. In support of this statement, at least in part, the ALJ appeared to rely on the "Prescreening Information Checklist" completed just prior to White's release. (R. 148.) As stated above, that form indicates that any information provided will be used by the SSA to determine priority of processing, not final eligibility. (*Id.*) We also note that on December 16, 2005, an examining physician checked "yes" in the area of the form asking whether the patient uses "Assistive Devices" for "Mobility Problems." (R. 249.) Although the physician only listed glasses next to that question, a cane would certainly fall in that category as well. In any event, White's use of his cane was documented in numerous records following his release from Dixon and certain records even indicate that White could not undergo cardiac treadmill testing due to ambulatory difficulties. (R. 339-340.)

The ALJ's reliance on evidence outside the record on the issue of White's earnings also requires remand.[5] According to ALJ Martin, White earned $8,290.50 in 2006, $7,896.50 of which she determined represented earnings from self employment. (R. 17.) ALJ Martin then relied on this finding to discredit White's testimony stating: "the

---

[5] White also takes issue with the ALJ's statement that he planned to enter Haymarket, (R. 25), arguing that she did not provide a proper cite to the record and that the record did not include any reference to Haymarket. But, to the contrary, it appears that ALJ Martin was referring to White's own statement in the Stroger ER on November 7, 2007. (R. 355.)

claimant's testimony regarding his work was hardly forthcoming as his earnings record indicated almost $7,900 in self employment at a time the claimant stated he was not working." (R. 25.) The ALJ did not cite to an exhibit in the record for this finding, nor did our review of the record reveal any support for this finding. *See Terry*, 580 F.3d at 477 (noting that the ALJ "must justify the credibility finding with specific reasons supported by the record."). The Commissioner's attempt to classify this error as harmless falls short because, as claimant properly points out, "it is impossible to determine whether the ALJ would have come to the same conclusion had she not assumed that Mr. White had worked in 2006." (Pl.'s Reply at 8.)

Finally, ALJ Martin stated that the infrequency in White's medical visits is "not indicative of the level of dysfunction he professes." (R. 25.) While the ALJ may consider the frequency of treatment in assessing the claimant's credibility, she may not draw any inferences "from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7, 1996 WL 374186, at *7. Here, ALJ Martin failed to question White regarding his infrequent treatment and failed to address references in the record regarding the problems he has faced seeking treatment. (*See* R. 337, 388-389.)

For all of these reasons, we conclude that the ALJ's credibility determination is deficient. On remand, the ALJ must re-visit that determination in light of all of the evidence in the record.

### D. The ALJ's RFC Determination was Deficient.

22

Claimant also argues that the ALJ's assessment of both her physical and mental RFC was based on insufficient consideration of the medical evidence. The RFC is the maximum that a claimant can still do despite his mental and physical limitations. *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008). In determining a claimant's RFC, the ALJ must consider all medically determinable impairments, physical and mental, even those that are not considered "severe." *Id.* at 676.

With respect to White's mental impairments, the ALJ agreed that White's depression and PTSD amount to severe impairments. (R. 22.) As a result of these impairments, she found that White has mild restrictions in activities of daily living, no difficulties in social functioning, and moderate difficulties with regard to concentration, persistence, or pace. (R. 22-23.) Then, after noting that the "claimant occasionally experiences auditory hallucinations and flashbacks," ALJ Martin limited White to "simple, routine and unskilled work." (R. 23.) ALJ Martin incorporated the same limitation into her hypothetical to the VE. (R. 60)

Claimant now argues that this assessment failed to sufficiently account for his mental limitations. We agree. Mental limitations are crucial to an RFC assessment because "[a] limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce [a claimant's] ability to do past work and other work." *Craft*, 539 F.3d at 676. The Seventh Circuit has explained that limitations like those ALJ Martin applied (and posed to the VE) do not usually account for limitations in concentration, persistence, and pace. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010)

23

(collecting cases).  Such limitations may be permissible when the ALJ "specifically excluded those tasks that someone with the claimant's limitations would be unable to perform."  *White v. Astrue*, --- F.Supp.2d ----, 2011 WL 5039802, * (N.D. Ill. Oct. 24, 2011).  But this is not the case here where ALJ Martin failed to articulate (and we cannot infer) how limiting White to unskilled, repetitive tasks accounts for, among other things, his hallucinations and flashbacks of the traumatic event involving his mother.  *See* SSR 85-15, 1985 WL 56857 (1985) (" A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job.").

Similarly disconcerting is that the ALJ wrote off White's hallucinations and flashbacks, and his twice calculated GAF score of 50, as unfortunate results of his failure to take his medication.  While the record does reflect a history of non-compliance, ALJ Martin failed to acknowledge that people with mental illness often struggle to stay on their medications due to adverse side effects.  *See Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011); *Spiva v. Astrue,* 628 F.3d 346, 351 (7th Cir. 2010).  Indeed, White testified that the combination of medications he is prescribed "drains him."  (R. 44.)

With respect to White's physical RFC, as we already discussed above, the ALJ erred in relying on the lack of a prescription for the cane.  We also note that ALJ Martin improperly relied on White's ability to walk 50 feet in Dr. Gaziano's office to support her finding that White is able to ambulate effectively.  *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (noting that the ability to ambulate 50 feet in a doctor's office does not necessarily demonstrate the ability to stand for 6 hours).  It is also unclear why the ALJ accepted Dr. Gaziano's May 1, 2006 assessment that White had only a 20%

24

limitation in walking and standing in an eight hour day (R. 328), but completely disregarded Dr. Gaziano's April 17, 2006 clinical impression that White has difficulty walking for longer than a block and a half. (R. 283.) Lastly, despite having determined that White's obesity was a severe impairment, ALJ Martin failed to address the effect of his obesity, if any, on White's RFC, as required by SSR 02–1p, 2000 WL 628049 (2002).

    For all of these reasons, we find that the ALJ failed to create a logical bridge between the evidence and her conclusion, and remand is required.

## III.   CONCLUSION

    For the reasons set forth above, White's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion. It is so ordered.


**ENTERED:**


_____

**MICHAEL T. MASON**
**United States Magistrate Judge**


**Dated:**      **November 7, 2011**